■ In the Matter of RENEE CHASE, for Appointment of a Personal Needs and Property Management Guardian of MURRAY CHASE, an Alleged Incapacitated Person, Appellant. JOYCE STRATTON et al., Respondents. [694 NYS2d 363] —Order and judgment (one paper), Supreme Court, New York County (Carol Arber, J.), entered on or about January 8, 1998, which, to the extent appealed from, denied that portion of petitioner's application which sought an order appointing her guardian over the person and property of her father, Murray Chase, and appointed a neutral guardian, Margaret Bomba, Esq., and supplemental order, same court and Justice, entered on or about February 6, 1998, which, to the extent appealed from, directed the payment of certain sums to the court evaluator and court appointed attorney, unanimously modified, on the law, the facts, and in the exercise of discretion, to delete the name of Margaret Bomba, Esq. as guardian of the person and property of Murray Chase, and insert the name of Renee Chase in her place upon compliance with the requirements of Mental Hygiene Law § 81.39 (b), adding a provision requiring the filing of an additional report in compliance with Mental Hygiene Law § 81.31 in the month of November, requiring each of the reports filed pursuant to Mental Hygiene Law § 81.31 and this order to contain a financial accounting verified by a certified public accountant as to its accuracy, requiring Murray Chase to be physically examined semi-annually by a court-appointed physician, and reducing the fees of the court evaluator and court-appointed attorney to $19,877 and $8,690, respectively, and otherwise affirmed, without costs.

On February 28, 1996, Murray Chase, a 71 year old divorced man, suffered a severe stroke and was admitted to St. Lukes-

Roosevelt Hospital, unable to communicate. Approximately one month later, he was transferred to a Manhattan nursing home where he remained until August 22, 1996, when he was discharged to his home apparently with little improvement.

It is uncontroverted that, in anticipation of his arrival, his adult daughter, Renee Chase, arranged for a wheelchair, a hospital bed, a physical therapist, as well as home health-care aides to provide her father with 24 hour care. Additionally, Ms. Chase established charge accounts at the grocery store and pharmacy, and saw to it that the bills for these items, as well as the rent and utilities, were paid. It also appears that, in October, 1996, Ms. Chase arranged for a geriatric case manager, Halley Glazer, to become involved in her father's care.

Thereafter, by a petition dated January 23, 1997, Ms. Chase commenced a proceeding pursuant to article 81 of the Mental Hygiene Law seeking, *inter alia*, to be appointed guardian of her father's person and property. A cross-petition, which was ultimately abandoned, was filed by a woman who was employed by Mr. Chase and appears to have lived with him for many years. After almost one year, various court appearances, a hearing, and the submission of reports from a court evaluator and temporary guardian, Supreme Court issued an order naming a non-family member as Mr. Chase's guardian. No factual findings attended the court's order as required by Mental Hygiene Law § 81.15. It is evident, however, that Supreme Court accepted the conclusions of the court evaluator and determined not only that Ms. Chase was inadequately caring for her father, but that her financial interests were adverse to his. Our review of the record leads us to conclude that Supreme Court erred in its acceptance of the court evaluator's conclusions.

It has long been the law in this State, under both article 81 of the Mental Hygiene Law and its precursors, that "strangers will not be appointed [guardian] of the person or property of the incompetent, unless it is impossible to find within the family circle, or their nominees, one who is qualified to serve" (*Matter of Dietz*, 247 App Div 366, 367; *see also, Matter of Klein*, 145 AD2d 145, *lv denied* 73 NY2d 705; *Matter of Weisman*, 112 AD2d 871). This well established preference may, of course, have to yield if it is determined that the proposed family member has failed to properly care for the incapacitated person, or that a conflict of interest exists between the family member and the incapacitated person (Mental Hygiene Law § 81.19 [d] [3], [8]). The initial issue that therefore emerges

concerns the quality of care provided to Mr. Chase by his daughter.

With respect to the personal care that Mr. Chase was receiving under the guidance of his daughter, the record fails to contain any meaningful evidence of inadequacy. As previously noted, upon being discharged to his home, a full compliment of medical equipment and staff awaited his arrival. Moreover, his geriatric case manager, Ms. Glazer, who visited Mr. Chase biweekly, characterized Ms. Chase as a loving, supportive and devoted daughter. Ms. Glazer stated that she had a "tremendous amount of respect for the way [Ms. Chase] has handled the situation" and that "she has done everything a caring, loving daughter should do" and that it would be "tragic to appoint anyone else as guardian" with respect to Mr. Chase's personal needs. A similar view was expressed by Pawel Szeparowics, a graduate of a foreign medical school who was working as a home-care worker while he was studying for his American medical exams. In fact, even the court-appointed evaluator (who ultimately recommended that Ms. Chase not be appointed as her father's guardian) was constrained to admit that Mr. Chase's person was being properly cared for, subject only to certain minor deficiencies that could be "easily corrected."

This evidence supports the conclusion that Ms. Chase was properly caring for her father not only at the time the petition was filed, but even prior thereto (Mental Hygiene Law § 81.19 [d] [3]). This, however, does not conclude the matter for the question remains whether there is a conflict of interest between Ms. Chase and her father that should preclude her appointment.

The court evaluator portrayed Ms. Chase as a greedy daughter who was raiding the assets of her incapacitated father. The basis for this portrayal was rooted in the transfer of certain assets to Ms. Chase and her brother, namely, bank accounts containing in excess of $500,000, and three parcels of real property located in Manhattan. While initial examination of these transfers could lead one to suspect improprieties, careful scrutiny reveals that the transfers were not nefarious and certainly not of a character to preclude Ms. Chase from serving as her father's guardian.

First, the bank accounts were transferred on October 3, 1995, approximately five months *before* Mr. Chase's stroke. These transfers were effectuated via a power of attorney that Mr. Chase executed that day in front of an assistant vice-president of Chase Bank. We agree with the court evaluator that there was a decline in Mr. Chase's mental and physical capacities.

However, the evidence does not show that he was legally incompetent at the time he executed the power of attorney (*see,* Mental Hygiene Law §§ 81.12, 81.29; *see also, Gala v Magarinos,* 245 AD2d 336). Second, as to the real property, Ms. Chase and her brother had commenced taking over control and management of these properties prior to their father having a stroke. Third, notwithstanding that Ms. Chase had taken control of her father's assets, she continued to provide for his care although there was no judicial oversight. Accordingly, the court evaluator's concern, namely, that Ms. Chase would not "spend sufficient money on [her father] knowing that every dollar spent [on him] will not be part of her inheritance," is not supported by the record.

It would also seem that Ms. Chase, in participating in these transfers, was concerned about protecting her father's assets from Mr. Chase's companion who, as previously noted, herself had initially made an effort to be named guardian. There are claims by Ms. Chase that this woman had attempted to access Mr. Chase's money and property by collecting rent checks that were not deposited into his bank accounts and withdrawing $20,000 from a New Jersey bank account.

Significantly, the aforementioned transfer of assets by Ms. Chase would also appear to have been consistent with the wishes of Mr.. Chase (*see, Matter of Wogelt,* 223 AD2d 309, 313). Seeking to establish this at the hearing in Supreme Court, Ms. Chase offered into evidence a videotape of her father taken just five months before his stroke. This video was taped by a professional production crew that was interviewing Mr. Chase, a Holocaust survivor, for the Steven Spielberg project documenting the Holocaust. It has not been controverted that, in the tape, Mr. Chase states that he gave his property to his children. However, the court, impatient with the speed at which the hearing was proceeding, did not provide Ms. Chase with an adequate opportunity to admit the tape into evidence. This evidence was crucial since it would have substantiated Ms. Chase's testimony that, far from being motivated by a conflict of interest, her actions were consistent with her father's wishes for the management of his finances (*see,* Mental Hygiene Law § 81.21 [a]; *Matter of John XX.,* 226 AD2d 79, *lv denied* 89 NY2d 814; *Matter of Steinberg,* 121 AD2d 872).

We thus conclude, contrary to Supreme Court, that Ms. Chase is the appropriate, and in fact preferred, choice as the guardian of her father's person and property. In so concluding, we recognize that, while the Mental Hygiene Law requires our courts to remain vigilant to protect vulnerable members of our

society, our courts must also remain vigilant to assure that the desire to provide protection is not transformed into an unwarranted intrusion into a close familial relationship (*cf., Matter of Rothman*, 263 NY 31). Such an intrusion is precisely what occurred here.

We note that, to the extent that there are legitimate concerns regarding potential improprieties, we believe such concerns are adequately addressed by requiring physical examination of Mr. Chase by a court-appointed physician until further order of the Supreme Court, and requiring Ms. Chase to file a report in conformance with Mental Hygiene Law § 81.31 twice yearly, the financial aspects of which shall be verified by a certified public accountant. In any event, as to the possibility of financial abuses, they have been largely diminished since, pursuant to an order of the Supreme Court dated September 23, 1998, the funds in the various bank accounts are restrained and may only be used for the benefit of Mr. Chase.

Finally, as to the fee awards made to the court evaluator and court-appointed attorney, consideration of all relevant factors leads us to conclude that the hourly rates awarded were excessive (*see, Matter of Potts*, 213 App Div 59, *affd* 241 NY 593). We therefore reduce such fees to $19,877 for the court evaluator, and $8,690 for the court-appointed attorney. Concur— Williams, J. P., Mazzarelli, Rubin, Saxe and Friedman, JJ