Matter of K.R.C. (2004 NY Slip Op 50660(U))

[*1]

Matter of K.R.C.

2004 NY Slip Op 50660(U)

Decided on June 24, 2004

Supreme Court, Tompkins County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on June 24, 2004

Supreme Court, Tompkins County
In the Matter of the Application of G.W.C., Petitioner for the Appointment of a Guardian of K.R.C., A Person Alleged to be Incapacitated
2004-0267

Michael A. Yehl, Esq., Attorney for Petitioner, Adams, Theisen, May, Miller & Yehl, 301 The Clinton House, 103 West Seneca Street, Ithaca, NY 14850. Katrina A. Thaler, Esq., Kristin R. Muenzen, pro hac vice, Attorneys for Cross-Petitioners, Thaler & Thaler, 309 North Tioga Street, Ithaca, NY 14851. Richard Wenig, Esq., Attorney for KRC, Mental Hygiene Legal Service, State Office Building, Floor 16, 44 Hawley Street, Binghamton, NY 13901-4435. Kay E. Friedlander, CSW, Court Evaluator, 1057 Taughannock Blvd., Ithaca, NY 14850.

Eugene E. Peckham, J.
This is a proceeding pursuant to Article 81 of the Mental Hygiene Law brought by GWC for the appointment of a guardian of the person and property of his daughter, KRC. LAL and RAC, KRC's sister and brother and also children of GWC, have cross-petitioned for their appointment as guardians, instead of their father.
All parties, including KRC, the incapacitated person, agree that she needs help with her finances and personal affairs. According to the Court Evaluator's Report, KRC has an IQ of 50 which places her in the range of mild mental retardation. Although the AIP is able to express her wishes to a limited extent, it is clear from the testimony, the Court Evaluator's Report and this Court's own observations of her that she is incapacitated and in need of a guardian.
A hearing was held on June 10 and 14, 2004 at which the main issue was who should be appointed guardian for KRC. A second issue related to the assets of KRC that had been accumulated for her by her mother and father. The source of these assets was KRC's Social [*2]Security checks and also monies earned by her from working at Challenge Industries.
In selecting a guardian, "the primary concern is for the best interests of the incompetent. This determination necessarily involves a judgment upon the facts and lies in the Court's discretion." Matter of VonBulow 63 NY2d221 (1984). This rule is equally true when the Court must decide between two competing sets of family members for the guardianship. In the exercise of this discretion, the Court has determined upon the facts, observation of the parties during their testimony, the recommendation of the Court Evaluator, and KRC's own wishes expressed in her testimony that LAL and RAC should be appointed guardians of KRC.
The children described their father in their testimony as "Stubborn, bull headed, penny pinching and controlling. A very critical man. Never heard thank you or good job." The Court Evaluator's report says "he has not provided an emotionally nurturing environment for KRC...
He is dogmatic and rigid and rather old fashioned in his views." Report, p.24. The Court's observations of GWC during his testimony would agree with this. All agreed that during her lifetime, MC, KRC's mother and GWC's wife, was KRC's primary caregiver. MC died in 1998. GWC as the family breadwinner was not particularly involved. Now he does not understand
how to deal with the real needs of his retarded daughter. He does not understand why she does not do what she is told, why she cannot cook and clean and do chores. He gives her
orders, which she resents and gets angry about, rather than dealing with her in the supportive way needed by a retarded person. He does not seem to understand that a retarded person needs constant cuing to perform activities of daily living. (ADL's).
While not perfect, the cross petitioners seem to have a better understanding of how to deal with a mildly retarded person. That she should be allowed to do fun things sometimes, have a little of her own money to spend as she sees fit, talk to her friends, go to dances and other activities sponsored by Challenge Industries, BOCES and other providers, take trips to visit her sister in New Jersey and her brother in Texas and so forth.
In response to a question from the Court as to who could provide a better emotional environment for KRC, the Court Evaluator stated : "Definitely not the Petitioner. There has been no love and tenderness for her since her mother died. GWC has said KRC is Lazy, Lazy, Lazy."
If the AIP nominates a guardian orally at the hearing, the Court is required to appoint the person nominated, unless the Court determines the nominee is unfit. MHL§81.19( c). KRC did state in her own testimony that she wanted to live with her sister and brother, LAL and RAC, and for them to make decisions for her. Richard Wenig, Esq. of the Mental Hygiene Legal Service, as Court appointed attorney for KRC, in his closing statement, requested the appointment of LAL and RAC as guardians.
 The Court Evaluator in her report has recommended the appointment of LAL and RAC. Report, p.23. The Court Evaluator's recommendation, which is not conclusive, is entitled to great weight. Matter of Luckert NYLJ 4/15/97 p.29, col.3 (Sup. Ct. Nassau Co.)
 Finally, it is well established that family members are to be preferred in selecting an appropriate guardian for an incapacitated person. Matter of Robinson 272 AD2d 176 (1st Dept. 2000); Matter of Rudick 278 AD2d 328 (2nd Dept.- 2000).
For all the foregoing reasons, it is the opinion of the Court that the best interests of KRC will result from the appointment of LAL and RAC as co-guardians of the person and property of KRC. The co-guardians are not unfit in the Court's estimation.
[*3]
Turning to the question of KRC's assets and finances, there was a great deal of testimony regarding transfers of KRC's money and the amount she should be given each week to spend for coffee at work, clothes, cosmetics, movies, etc. Her father testified that he thought $10.00 per week was sufficient for these purposes. The other children disagreed.
GWC has provided contradictory testimony as to the extent of his daughter's assets and bank accounts. At one point in his testimony he stated that he and his wife had saved $116,000 for KRC. Yet in an affidavit of her assets submitted at the Court's order, he identifies only $55,920. in withdrawals, $13,898. in an annuity, $1,000. returned to an account and a $932. Social Security check. Presented as Cross-Petitioner's Exhibit No.1 is an unexplained withdrawal by him of $29,546.29 on February 5, 2004. Therefore, it will be the responsibility of the co-guardians to do a thorough investigation to locate all of KRC's assets and to marshal and collect them to be used for her benefit. This would include collecting any monies or property to which KRC might be entitled as a distributee of her mother's estate since MC died intestate. See EPTL §4-1.1. Consideration should be given to placing at least a portion of this money in a Supplemental Needs Trust for KRC's protection and so she can qualify for Medicaid.
There was also uncontradicted testimony that LAL and RAC utilized a Power of Attorney obtained from KRC to withdraw $50,000. from accounts of KRC's and deposit it in an account in the name of RAC alone. RAC testified the power of attorney was obtained and the money transferred only to protect KRC's money and he made no claim to it and that it would be returned to KRC when a guardian was appointed. This testimony was corroborated by LAL and VS, another sister. While perhaps not the best plan, the testimony also established that this was in accord with KRC's wishes to obtain more control over her assets and spending money. The power of attorney was signed at the bank at the suggestion of a bank official. The notary who notarized KRC's signature read and explained the document to her. In a similar case, the First Department reversed the appointment of a non-family member and appointed the incapacitated person's daughter despite the fact the daughter had transferred to herself $500,000. of her father's assets. It was established that this was done consistent with the father's wishes before he suffered an incapacitating stroke. Matter of Chase, 264 AD2d 330 (1st Dept. 1999).
In the present case, it is clear KRC wanted to be able to have more money to spend on personal things than the $10. per week her father was allowing her. Her siblings acted to try to wrest control of her finances from their father. In order to do so they followed the instructions of a bank official. The method used was not proper because KRC undoubtedly lacked the capacity to understand the significance of a power of attorney. She cannot read, write more than her name, or do math. The motivation to help their sister with her finances was proper, however. Accordingly, the Court finds that the actions taken by LAL and RAC were consistent with KRC's wishes, motivated by a concern for her well being and ultimately not detrimental to her since RAC has clearly testified the money placed in his account is KRC's money, not his, and will be returned to her. Furthermore, any concern for the ability of the siblings' to handle KRC's finances is overcome by their expressed willingness to seek advice from competent professionals, the requirement for guardians to file annual reports and a requirement for the guardians to post a bond. Cf. Matter of Robinson, supra; Matter of Chase, supra.
KRC's attorney in his closing statement also moved for the Court to cancel both Powers of Attorney executed by KRC and to authorize the establishment of a supplemental needs trust [*4]for her benefit.
In accordance with the foregoing, it is hereby
ORDERED that LAL and RAC are hereby appointed as co-guardians of the person and property of KRC; and it is further
ORDERED that the Co-Guardians file with this Court a bond in the principal amount of $100,000; and it is further
ORDERED that pursuant to Sections 81.21 and 81.22 of the Mental Hygiene Law, the co-guardians shall have the following powers:
PROPERTY MANAGEMENT POWERS
1)Transact any banking business including establishing checking accounts, savings accounts, certificates of deposit, collecting, negotiating, depositing, withdrawing, endorsing checks, drafts, or any negotiable instrument and any incidental powers related thereto.
2)Prosecute, defend, settle, and maintain any cause of action, arbitration, or civil judicial proceeding. Any settlement for the payment or receipt of more than $10,000 shall require the approval of the Court.
3)Marshal all income and assets, and necessary incidental powers to effectuate such power including power to open and inventory safe deposit boxes, and the power to redirect and open any and all mail directed to the Incapacitated Person.
4)Prepare, complete, and sign all tax returns, and pay the tax due as shown by said returns; appear on behalf of KRC before Federal, State and Local taxing authorities; prosecute, defend and settle all tax claims, litigation, assessments and levies relating to any taxing authority or any type of tax.
5)Establish, terminate, change or complete any transaction regarding pension retirement incentives, IRA/Keogh/SEP and similar plans, programs and annuities.
6)Compromise, forgive, collect, prosecute, pay, and settle debts with creditors and debtors.
7)Endorse, collect, negotiate, deposit and withdraw Social Security, pension or annuity benefit checks.
8)Apply, negotiate, prosecute and settle actions, claims and arbitrations for government entitlements and benefits of all kinds with any governmental administration or agency. Any settlement for the payment or receipt of more than $10,000 shall require the approval of the Court.
9)Enter into, rescind, assign, repudiate any and all contracts.
[*5]
10)Create revocable or irrevocable or supplemental needs trusts of property which may extend beyond the incapacity or life of KRC with the terms thereof to be approved by the Court.
11)Authorize access to or release confidential records.
12)To purchase, sell, hypothecate, assign and pledge stocks, bonds, mutual funds, stock rights, stock dividends, coupons and all securities, and to retain investment advisors and/or stock brokers to manage same.
13)Retain attorneys, accountants, auctioneers, appraisers, property managers and real estate brokers and to pay the necessary disbursements and fees for such individuals upon approval by the Court.
14)Pay the funeral expenses of KRC.
15)Lease real property for the benefit of KRC.
16)File, prosecute, compromise and settle all personal and property insurance claims and all incidental powers related thereto necessary to effectuate this power, including without limitation to surrender insurance policies for cash value. Any settlement for the payment or receipt of more than $10,000 shall require the approval of the Court.
17)Change beneficiaries on life insurance or annuity policies owned by KRC upon authorization by the Court.
18)Pay bills after death, if the debts were incurred prior to death and if authority to pay any such bill would otherwise have existed.
PERSONAL NEEDS POWERS
19)Determine who shall provide the personal care, health care and assistance for the personal needs and health of KRC. To enter into contracts for the same and pay such persons, firms or corporations.
20)Make decisions regarding social environment and other social aspects of the life of KRC.
21)Determine whether KRC should travel or should have a license to drive an automobile.
22)Make decisions regarding education of KRC and participation in mental health programs and the necessary powers to implement such decisions.
[*6]
23)Consent to or refuse generally accepted routine or major medical or dental treatment; provided (a) treatment decisions shall be made in accordance with KRC's wishes, religious and moral beliefs, or, if such are not known and cannot be ascertained with reasonable diligence, in accordance with KRC's best interests, including a consideration of the dignity and uniqueness of every person, the possibility and extent of preserving life, the preservation or improvement or restoration of health or functioning, relief of suffering, adverse side effects of treatment, less intrusive alternative treatments, and such other concerns and values of a reasonable person in KRC's circumstances, and (b) such treatment decision is made with consideration of the requirements of Mental Hygiene §81.15.
24)Choose the place of abode of KRC, consistent with the Findings pursuant to Section 81.15 of the Mental Hygiene Law, including the power to move KRC to a residential facility as those terms are defined in the Public Health Law §2801, and consistent with the factors set forth in Section 81.22(a)(9) of the Mental Hygiene Law; and it is further
ORDERED that the Powers of Attorney from KRC to LAL and RAC, dated February 25, 2004, and to GWC and PL, dated March 23, 2004, are hereby revoked and cancelled; and it is further
ORDERED that the co-guardians in their initial report to the Court pursuant to Section 81.30 of the Mental Hygiene Law shall report on the advisability of establishing a supplemental needs trust for KRC and also on the feasibility and desirability of her living in a group home or assisted living facility; and it is further
ORDERED that the duration of the guardianship shall be until further order of this Court; and it is further
ORDERED that for good cause shown pursuant to Section 81.14 of the Mental Hygiene Law the record of these proceedings is sealed; and it is further
ORDERED that the Temporary Order with Restraining Order signed by this Court on May 11, 2004, is revoked and terminated effective upon the day the commission to the co-guardians is issued by the Clerk of the Court.
The attorneys for cross-petitioners shall submit Findings and Judgment for settlement in accordance with this decision within 10 days from the date hereof.
Dated: June 24, 2004___________________________________
Eugene E. Peckham
 Acting Supreme Court Justice